**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

GARY GONZALES,

    Plaintiff,

vs.    Civ. No. 19-1038 KK

ANDREW SAUL, Commissioner of the
Social Security Administration,

    Defendant.

## MEMORANDUM OPINION AND ORDER[1]

THIS MATTER is before the Court on Plaintiff Gary Gonzales' ("Mr. Gonzales") Motion to Reverse and/or Remand (Doc. 19) ("Motion"), filed April 10, 2020, seeking review of the unfavorable decision of Defendant Andrew Saul, Commissioner of the Social Security Administration ("Commissioner"), on Mr. Gonzales' claim for Title II disability insurance benefits under 42 U.S.C. §§ 405(g) and 1383(c)(3). The Commissioner filed a response in opposition to the Motion on June 17, 2020, (Doc. 23), and Mr. Gonzales filed a reply in support of the Motion on June 26, 2020.  (Doc. 24.)  Having meticulously reviewed the entire record and the applicable law and being otherwise fully advised in the premises, the Court FINDS that Mr. Gonzales' Motion is well-taken and should be GRANTED.

### I.    BACKGROUND

**Mr. Gonzales' Work and Medical Treatment History**

Mr. Gonzales is a fifty-three-year-old man who has a high school education and worked for the City of Albuquerque for twenty-seven years. (Administrative Record ("AR") 036, 038-39.) He started as a basic wastewater operator and worked his way up to superintendent of wastewater

---

[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case.  (Doc. 16.)

1

collections, overseeing a million-dollar budget and the work of ten-to-twenty employees. (AR 039-40, 056, 210-11.) His long-term plan was to "carry[] on another job" as a superintendent elsewhere and eventually retire. (AR 056.)

However, in July 2008 he was rear-ended while in his work vehicle and suffered a lumbar disc displacement. (AR 040-41, 312, 614.) He was off work for the first 10-14 days following the accident and then returned to work on light duty with lifting, carrying, and driving restrictions. (AR 040-41.) He was not allowed to drive a work vehicle due to the pain medication he was on and eventually "felt pressured" to retire. (AR 041.) He last worked in November 2009[2], at which time he took an "early retirement." (AR 036-37, 041-42.)

Since his 2008 injury, Mr. Gonzales has received medical treatment for and management of his back condition and chronic pain at Concentra Totalcare Occupational Health. (*See* AR 789-94, 836.) Dr. William Prickett, M.D. has been his primary provider there for the past twelve years. (*See* AR 042, 299, 311-14.) Mr. Gonzales sees Dr. Prickett quarterly, sometimes more frequently, for refills of his prescription medications and for referrals to pain management specialists. (AR 041, 042, 790-94.)

In October 2008, Timothy E. Hansen, D.O., at Southwest Interventional Pain Specialists gave Mr. Gonzales a left sacroiliac joint injection to treat his "significant left low back and left-greater-than-right gluteal pain." (AR 305.) Dr. Hansen also saw Mr. Gonzales ten times between January 2011 and August 2014 for treatment of his chronic low back pain. (AR 291-303, 305-306.) Specifically, in 2011 and 2012, Dr. Hansen treated Mr. Gonzales with bilateral L4-L5 and L5-S1 facet joint injections, which proved effective in controlling Mr. Gonzales' pain for between five and eight months at a time. (AR 295, 297-302, 305.) In May 2013, Dr. Hansen recommended

---

[2] The record indicates that Mr. Gonzales had earnings through most of 2011 (AR 183), which he explained was because he had used accrued sick and vacation leave to retire early. (AR 036-37.)

radiofrequency treatment instead of injections to provide longer-term relief and reduce Mr. Gonzales' need for steroid medication to control his pain. (AR 295; *see* AR 311-14.) Dr. Hansen treated Mr. Gonzales with radiofrequency treatment four times between May 2013 and August 2014. (AR 291-95.)

After Mr. Gonzales indicated to Dr. Prickett that he was no longer happy with Dr. Hansen, Dr. Prickett referred Mr. Gonzales to other pain management specialists. (AR 791, 792.) Mr. Gonzales first transferred his pain-management care to James H. Rice, M.D., at Southwest Interventional Pain Specialists, and eventually established with Edward Poon, M.D., at Pain Consultants and Intervention. (*See* AR 792-93, 828-32; *see also* AR 305.) Dr. Poon performed lumbar facet blocks and radiofrequency ablations on Mr. Gonzales' lower back on at least three occasions in 2016 and 2017. (*See* AR 792-93, 828-32.)

In January 2016, Dr. Prickett noted that Mr. Gonzales was "VERY despondent and tearful following the abrupt death of his younger brother" the month before. (AR 792.) Mr. Gonzales reported that his brother had assisted in the 24-hour care of their "ailing mother" and that he was feeling "alone and overwhelmed." (*Id.*) Dr. Prickett advised Mr. Gonzales to "[s]eek medical treatment for depression." (*Id.*) In April 2016, Mr. Gonzales reported that he was receiving help with caring for his mother, sleeping more, and "feeling better." (*Id.*)

In August 2016, Mr. Gonzales saw psychologist Marita Campos-Melady, Ph.D., for an initial behavioral health assessment. (AR 727-30.) Dr. Campos-Melady documented that Mr. Gonzales had a "longstanding h[istory] of depression, anxiety and chronic back pain" and that he "currently presents with s[ymptoms] including depressed mood, anhedonia, insomnia, fatigue and difficulty concentrating and nervousness, worry, anxiety, and uncontrolled chronic back pain recently exacerbated by stress of being sole caregiver for mother with dementia and [P]arkinson's,

deaths of brother and close friend in the past year." (AR 728.) Mr. Gonzales reported that the onset of symptoms occurred "approximately 5 years ago," i.e., in 2010-2011, and that his symptoms had been "gradually worsening since that time." (*Id.*) He had a score of fourteen (14) on his anxiety screening (GAD-7), indicating "moderate anxiety," and a score of fifteen (15) on his depression screening (PHQ-9), indicating "moderately severe depression." (AR 729.) Dr. Campos-Melady's observations included that Mr. Gonzales was "teary at times" and that he had a "stressed" mood and "sad" affect that improved by the end of the session. (AR 729.) Her diagnostic impressions comprised major depressive disorder recurrent moderate, adjustment disorder with anxious mood, psychosocial factors contributing to chronic pain, and complicated bereavement. (AR 729.) She noted that Mr. Gonzales reported "significant stigma-beliefs about mental health treatment and conditions" and was "ambivalent" about treatment but "open to discussion of coping skills" and agreed to schedule a follow-up session. (*Id.*) No other mental health treatment records appear in the record, and at his administrative hearing, Mr. Gonzales stated that he was not receiving any mental health treatment and found it "difficult . . . to deal with" his feelings. (AR 046.)

**Procedural History and Medical Opinions**

Mr. Gonzales filed his DIB claim on March 28, 2016, alleging a disability onset date of December 31, 2010 due to "Back Injury, Chronic Back Pain, Depression, Arthritis." (AR 061-62, 170-71.) He was referred by Disability Determination Services to David LaCourt, Ph.D., for a consultative psychological examination, which Dr. LaCourt performed on September 7, 2016. (AR 734-36.) Dr. LaCourt's diagnostic impressions were (1) somatic symptom disorder, persistent, with predominant pain, moderate severity, and (2) depressive disorder due to a medical condition (persisting back/leg pain). (AR 735.) In relevant part, he found that Mr. Gonzales has *moderate* limitations in the following basic mental functioning areas: (1) "[s]ustained concentration/task

4

persistence, for carrying out instructions"; (2) "working without supervision: moderate limitation associated with impersistence"; (3) social interaction with coworkers; and (4) social interaction with supervisors. (AR 735.)

State agency consultants Cathy Simutis, Ph.D., and Paul Cherry, Ph.D., reviewed Mr. Gonzales' case at the initial and reconsideration levels in October 2016 and March 2017, respectively. (AR 072-74, 090-93.) They both accorded "great weight" to Dr. LaCourt's opinions, finding them "consistent with evidence[.]" (AR 069, 087.) In completing their respective mental residual functional capacity assessments ("MRFCA"), Drs. Simutis and Cherry indicated in their preliminary findings that Mr. Gonzales is, *inter alia*, *moderately* limited in his ability to (1) accept instructions and respond appropriately to criticism from supervisors and (2) interact with the general public, but *not significantly limited* in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (AR 073, 092.) In their narrative explanations, however, both concluded that Mr. Gonzales "can . . . interact adequately with co-workers and supervisors." (AR 074, 092.)

Mr. Gonzales was found to be "not disabled" both initially and on reconsideration based, in part, on Drs. Simutis and Cherry's findings. (AR 076, 094.) He requested a hearing before an administrative law judge ("ALJ") (AR 110-111), and a hearing was held before ALJ Stephen Gontis on August 8, 2018. (AR 032.) Mr. Gonzales and impartial vocational expert ("VE") Zachariah Langley testified. (AR 033.) ALJ Gontis issued his unfavorable decision on November 21, 2018. (AR 012-26.)

**The ALJ's Decision**

The ALJ found that Mr. Gonzales has three severe impairments—lumbar degenerative disc disease, affective disorders, and somatic disorders—but that none was presumptively disabling

under the Social Security Listings.[3] (AR 017-19.) He therefore proceeded to assess Mr. Gonzales' residual functional capacity ("RFC"), finding, in relevant part, that Mr. Gonzales

> is limited to more than simple, but less than complex tasks consistent with semi-skilled work; he can *frequently interact with supervisors*, but only occasionally interact with coworkers and the public. He is limited to tolerating few changes in a routine work setting. His time off task can be accommodated by normal breaks.

(AR 019 (emphasis added).) Although the ALJ found that Mr. Gonzales could not perform his past relevant work given the RFC he assessed (AR 024), he found that Mr. Gonzales would be able to perform other jobs that exist in significant numbers in the national economy, specifically (1) bottling line attendant, (2) assembler, production, and (3) cleaner, housekeeping. (AR 024-25.) He therefore found that Mr. Gonzales was "not disabled." (AR 025.) Mr. Gonzales sought review by the Appeals Council, which denied Mr. Gonzales' request. (AR 001-3, 164-69.) Mr. Gonzales then appealed to this Court. (Doc. 1.)

## II.   APPLICABLE LAW

**A.   Standard of Review**

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence and whether the Commissioner applied the correct legal standards to evaluate the evidence. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In making these determinations, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not reexamine the issues de novo. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

---

[3] *See* 20 C.F.R. 20 C.F.R. pt. 404, subpt. P, app. 1, pt. A.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004) (quotation marks omitted). Substantial evidence is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118 (quotation marks omitted), or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The Court's examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

**B.     Disability Benefits and the Sequential Evaluation Process**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy[.]" 42 U.S.C. § 423(d)(2)(A). "To qualify for disability benefits, a claimant must establish a severe physical or mental impairment expected to result in death or to last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity." *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).

When considering a disability application, the Commissioner uses a five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(4); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At

the first four steps of the evaluation process, the claimant must show that: (1) he is not engaged in "substantial gainful activity"; *and* (2) he has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) his impairment(s) meet or equal one of the Listings of presumptively disabling impairments; *or* (4) he is unable to perform his "past relevant work." 20 C.F.R. § 404.1520(a)(4)(i-iv). If the claimant can show that an impairment meets or equals a Listing at step three, the claimant is presumed disabled and the analysis stops. 20 C.F.R. § 404.1520(a)(4)(iii). If at step three the claimant's impairment is not equivalent to a listed impairment, the ALJ must next consider all of the relevant medical and other evidence and determine what is the "most [the claimant] can still do" in a work setting despite his physical and mental limitations. 20 C.F.R. § 404.1545(a)(1)-(3). This is called the claimant's residual functional capacity. 20 C.F.R. § 404.1545(a)(1), (a)(3). The claimant's RFC is used at step four of the process to determine if he can perform the physical and mental demands of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv), (e). In reaching a determination regarding the claimant's RFC, the ALJ must consider the limiting effects of *all* of the claimant's impairments, not only those found to be "severe" at step two. 20 C.F.R. § 404.1545(e). If the claimant establishes that he is incapable of meeting the demands of his past relevant work, the burden of proof then shifts to the Commissioner at step five to show that the claimant is able to perform other work in the national economy, considering his RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v); *Grogan*, 399 F.3d at 1261.

### III.   Discussion

Mr. Gonzales argues that the ALJ erred by failing to include—and failing to explain why he did not include—"moderate limitations" in Mr. Gonzales' ability to interact with supervisors, coworkers, and the general public in the RFC he assessed in light of the medical opinions regarding

his limitations in these areas. (Doc. 19 at 13-14.) The Commissioner argues that the RFC the ALJ assessed adequately accounted for the medical sources' opinions regarding Mr. Gonzales' social limitations and is supported by substantial evidence. (Doc. 23 at 7-10. For the following reasons, the Court agrees with Mr. Gonzales that the ALJ erred in assessing Mr. Gonzales' RFC, necessitating reversal and remand.

### A. The Law Regarding RFC Assessment

A claimant's RFC represents "the most [the claimant] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1). The RFC assessed should reflect the claimant's "ability to meet the physical, mental, sensory, and other requirements of work" and must be "based on all the relevant evidence in [the claimant's] record[,]" i.e., both medical and nonmedical evidence. 20 C.F.R. § 404.1545(a)(1)-(4). "In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule)[.]" SSR 96-8p, 1996 WL 374184, at *7 (Jul. 2, 1996). "[T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question." *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2010). The process of assessing a claimant's RFC requires that the adjudicator "evaluate[] and interpret[] medical and other evidence[,]" Social Security Program Operations Manual Systems ("POMS") § DI 24510.005.A, and make findings regarding the claimant's functional abilities and limitations based on a distillation of the evidence on the whole. *See* 20 C.F.R. § 404.1545(a) ("We will assess your residual functional capacity based on all the relevant evidence in your case record.").

Nevertheless, "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator

9

must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, at *7. "The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p, 1996 WL 374184, at *7. While adjudicators can sometimes account for mental limitations indicated in the medical opinions by limiting the claimant to particular kinds of work, *see Vigil v. Colvin*, 805 F.3d 1199, 1203-04 (10th Cir. 2015), "[u]nless the connection (between the limitation and the work) is obvious, . . . the agency must ordinarily explain how a work-related limitation accounts for mental limitations reflected in a medical opinion." *Parker v. Comm'r, SSA*, 772 F. App'x 613, 616 (10th Cir. 2019) (unpublished)[4].

"The RFC assessment must include a narrative discussion *describing* how the evidence supports each conclusion, citing *specific* medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7 (emphases added). Conclusory and generic findings regarding what the evidence shows, as well as findings that fail to reflect consideration of evidence that undercuts those findings, are insufficient to support a decision. *See Barnett v. Apfel*, 321 F.3d 687, 689 (10th Cir. 2000) ("The ALJ is charged with carefully considering all the relevant evidence and linking his findings to specific evidence."); *Clifton*, 79 F.3d at 1010 ("[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.").

### B. The ALJ Erred in Evaluating the Medical Opinions Vis-à-vis his Assessment of Mr. Gonzales' RFC

---

[4] Unpublished decisions are not binding precedent in the Tenth Circuit but may be cited for their persuasive value. *United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005).

The ALJ found, *inter alia*, that Mr. Gonzales retains the functional capacity to interact (1) frequently with supervisors, (2) occasionally with coworkers, and (3) occasionally with the public. (AR 019.) In the context of nonexertional limitations, "frequently" means an individual can perform the activity "from one-third to two-thirds of the time"—i.e., up to more than five hours per day—while "occasionally" means an individual can perform the activity "from very little up to one-third of the time"—i.e., up to approximately two-and-a-half hours per day. SSR 85-15, 1985 WL 56857, at *6 (Jan. 1, 1985); *see* SSR 96-8p, 1996 WL 374184, at *7 (explaining that RFC is assessed based on an individual's ability to work for "8 hours a day, for 5 days a week, or an equivalent work schedule"). Thus, the RFC the ALJ assessed reflects the ALJ's conclusion that Mr. Gonzales is more limited in his ability to interact with coworkers and the public than in interacting with supervisors. Mr. Gonzales argues that that this conclusion is "directly contradicted by the medical opinions of record to which the ALJ afforded significant weight" and that the ALJ failed to explain that discrepancy. (Doc. 24 at 2.) The Court agrees.

In discussing the various medical opinions, the ALJ stated, in relevant part, that Dr. Cherry found that Mr. Gonzales has "*mild* limitations interacting with others" (emphasis added), that Dr. Simutis found that Mr. Gonzales has "moderate limits in social interaction[,]" and that Dr. LaCourt found that Mr. Gonzales has a "moderate limitation" regarding social interaction with coworkers and supervisors. (AR 022, 023.) The ALJ's summation of the evidence, specifically Dr. Cherry's opinion, is not accurate. Dr. Cherry did not find that Mr. Gonzales has "mild limitations interacting with others." While Dr. Cherry found Mr. Gonzales to be "[n]ot significantly limited," i.e., mildly limited, in his ability to get along with coworkers or peers, he found that Mr. Gonzales is *moderately* limited in his ability to interact appropriately with the general public and, critically, accept instructions and respond appropriately to criticism from supervisors. Indeed, Dr. Cherry's

11

social interaction findings are identical to Dr. Simutis', which the ALJ more accurately described as indicating "moderate limits in social interaction." And Dr. Cherry's finding regarding Mr. Gonzales' ability to interact with supervisors, specifically, is identical to both Dr. Simutis' and Dr. LaCourt's, meaning the finding of a *moderate* limitation is uncontroverted, a point that the ALJ's decision fails to acknowledge.

Notably, the ability to, on a sustained basis, respond appropriately to supervision—specifically, to "accept instructions and respond appropriately to criticism from supervisors"—is one of the basic mental abilities needed for *any* job. 20 C.F.R. § 404.1545(c); Program Operations Manual System ("POMS") § DI 25020.010.B.2.c. A "substantial loss of ability" in this area may "severely limit[] the potential occupation base" and would thus "justify a finding of inability to perform other work even for persons with favorable age, education and work experience." POMS § DI 25020.010.A.3.b; *see* 20 C.F.R. § 404.1545(c) ("A limited ability to carry out certain mental activities, such as . . . responding appropriately to supervision, . . . may reduce [the claimant's] ability to do past work and other work."). Determinations regarding whether a claimant has a substantial loss of a basic mental activity must be made based on the evidence overall, *see id.*, including medical opinions indicating that the claimant has a moderate limitation or impairment. *See Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007) (explaining that "a moderate impairment is not the same as no impairment at all" and holding that there was reversible error where the ALJ rejected, without explanation or evidentiary support, certain "moderate impairments" found by a medical consultant but adopted other "moderate" restrictions found by the same consultant).

On the critical question of what the medical opinions indicated regarding Mr. Gonzales' limitation in interacting with supervisors, the ALJ failed to correctly describe the evidence in the

first instance. This alone is problematic because it leaves the Court unable to say that the ALJ properly considered and based his decision on the actual and substantial evidence of record.[5] Moreover, despite finding—albeit erroneously—that Dr. Cherry assessed only *mild* social interaction limitations while Drs. Simutis and LaCourt assessed *moderate* limitations, the ALJ accorded all three opinions "significant weight." In other words, he accorded equal weight to Dr. Cherry's (purported) opinion that Mr. Gonzales has only "mild" social interaction limitations and to Drs. Simutis and LaCourt's conflicting opinion that Mr. Gonzales' social interaction limitations are "moderate." He then effectively adopted Dr. Cherry's opinion over Drs. Simutis and LaCourt's by finding that Mr. Gonzales can "frequently interact with supervisors." Yet he offered no explanation to either reconcile the obvious discrepancy in the evidence as he described it or justify his effective rejection of Drs. Simutis and LaCourt's opinions. The Court finds it impossible to follow the ALJ's inaccurate and internally inconsistent discussion of how the medical-opinion evidence supports the RFC he assessed.

The Commissioner offers three alternative ways to read the ALJ's decision, each of which he contends would allow the Court to affirm his disability determination. He first argues that the ALJ's limitation of Mr. Gonzales to frequent, as opposed to constant, interaction with supervisors

---

[5] The Court notes that this is not the only instance where the ALJ's description of the evidence is manifestly incorrect. The ALJ's decision is replete with inaccurate, incomplete, decontextualized descriptions of portions of the record and mischaracterizations of what the evidence shows. For example, in discussing Mr. Gonzales' radiofrequency treatments with Dr. Hansen, the ALJ stated, "He had also [sic] radiofrequency treatment procedures in 2013. However, the doctor since retired and they did not continue treatment[.]" (AR 021.) The ALJ cited Dr. Prickett's treatment summary from Mr. Gonzales' April 13, 2016 visit in support of this statement. However, the record the ALJ cited says nothing about Dr. Hansen retiring or supports the suggestion that Mr. Gonzales "did not continue treatment." Dr. Prickett's treatment notes make clear that Mr. Gonzales transferred his pain management care because he was unhappy with Dr. Hansen, not because Dr. Hansen retired. Additionally, while Dr. Prickett's treatment record states, "He has been medically retired since November 2011[,]" it is obvious from the context of the note—as well as from the record on the whole— that the statement is referring to *Mr. Gonzales* having retired early from the City because of his work-related injury. The ALJ himself recognized this earlier in his decision, stating, "The claimant has been retired since November 2011" and citing the same treatment record he later mischaracterized. (*See* AR 020.) This—and other similar examples of the ALJ failing to accurately and fairly document the evidence on the whole—renders his assessment of the evidence and how it supports his various findings suspect.

adequately accounts for the *moderate* limitation found by all three medical sources. (Doc. 23 at 7.) The Court disagrees. By finding that Mr. Gonzales can interact frequently with supervisors, the ALJ effectively found that Mr. Gonzales can have appropriate interactions with supervisors—i.e., accept instructions and respond appropriately to criticism from supervisors—for the majority of a workday, five days a week. The ALJ provided no explanation and identified no evidence that supports such a finding, and the uncontroverted evidence of record—medical and nonmedical—tends to preclude such a finding.

Specifically, Mr. Gonzales reported in his May 2016 function report that he "used to have lots of company," including his kids, friends, and family, for whom he liked to cook (AR 201) but that the only people he spends time with anymore are his children. (AR 203.) He also reported that he does not go places such as church, the community center, sports events, or social groups. (AR 203.) His children describe him as "withdrawn," and he reported that he is "short-temp[ered], irritable, [and] impatient[,]" which he attributed to his pain, pain medications, and depression. (AR 203, 205.) He reported having problems getting along with others and being able to tolerate them. (AR 204.) In response to the question, "How well do you get along with authority figures?" he responded, "Keep to myself[.]" (AR 205.) At his administrative hearing, Mr. Gonzales testified that he also spends time with his five grandchildren but that he "becomes tired, miserable" when doing things like taking them shopping. (AR 044, 047-48.) He described getting "irritable, sometimes just short, short with patience." (AR 044.)

Dr. Campos-Melady diagnosed Mr. Gonzales with, *inter alia*, major depressive disorder and adjustment disorder with anxious mood. (AR 729.) She indicated that Mr. Gonzales "would likely benefit from [seeing a] specialty mental health/community provider" and utilizing behavioral activation, relaxation techniques, behavioral pain management, and mindfulness to help

14

treat his conditions. (*Id.*) Dr. LaCourt likewise diagnosed Mr. Gonzales with depressive disorder, specifying it was "due to medical condition (persisting back/leg pain)[,]" and also diagnosed "Somatic Symptom disorder, persistent, with predominant pain, moderate severity." (AR 735.) He noted that Mr. Gonzales reported "ongoing" back pain and a decrease in the effectiveness of treatment over time. (AR 734.) Although he described Mr. Gonzales as "pleasant and cooperative throughout the visit[,]" he described Mr. Gonzales' mood as "pessimistic and dysphoric[.]" (AR 735.) He ultimately found that in the areas of "[s]ocial interaction . . . with coworkers [and] with supervisor[s]," Mr. Gonzales has a *moderate* limitation. (AR 735.) Finally, like Dr. LaCourt, Drs. Simutis and Cherry found that Mr. Gonzales has *moderate* limitations in his ability to "accept instructions and respond appropriately to criticism from supervisors." (AR 073, 092.)

The Court fails to see—and the ALJ failed to explain—how the foregoing evidence supports finding that Mr. Gonzales can frequently interact with supervisors. Moreover, because the connection between the medical sources' finding of a "moderate" limitation in ability to interact with supervisors and the ALJ's durational assessment of Mr. Gonzales to frequent interaction with supervisors is not obvious, the ALJ should have explained—with citation to specific evidence—how the work-related limitation he assessed accounted for the social-interaction limitation expressed in the medical opinions. *See Parker*, 772 F. App'x at 616; *Duran v. Berryhill*, No. 18-cv-0734 SMV, 2019 WL 1992103, at *4 (D.N.M. May 6, 2019) (concluding that a limitation to "frequent interactions with supervisors" failed to account for medical opinions that assessed a "moderate" limitation in interacting with supervisors). He failed to do so.

The Commissioner next suggests that the ALJ's restriction of Mr. Gonzales to "certain kinds of work activity" sufficiently accounted for all the moderate limitations found by the medical sources. (Doc. 23 at 8.) The Court acknowledges that in this Circuit, "an administrative law judge

can account for moderate limitations by limiting the claimant to particular kinds of work." *Smith v. Colvin*, 821 F.3d 1264, 1269 (10th Cir. 2016). But that is clearly not what the ALJ did—or intended to do—in this case, at least not with respect to Mr. Gonzales' limitation in interacting with supervisors. Here, the ALJ *first* limited the "particular kinds of work" Mr. Gonzales can do to "more than simple, but less than complex tasks consistent with semi-skilled work[.]" (AR 019.) He *then* and *separately* assessed a specific limitation regarding Mr. Gonzales' ability to interact with supervisors. Thus, the Commissioner's reliance on *Smith* is misplaced, and his speculative suggestion that the ALJ's skill level assessment accounted for the medical sources' moderate limitation is also unavailing.

Finally, the Commissioner argues that "[i]t was not error for the ALJ to rely on [Drs. Simutis and Cherry's] *conclusions* that [Mr. Gonzales] could adequately interact with supervisors in assessing [his RFC] and limiting him to frequently (rather than constantly) interacting with supervisors[.]" (Doc. 23 at 8-9.) Here, the Commissioner is referring to the fact that despite their preliminary findings indicating that Mr. Gonzales is *moderately* limited in interacting with supervisors, Drs. Simutis and Cherry both concluded in their "MRFC – Additional Explanation" that Mr. Gonzales "can . . . interact adequately with co-workers and supervisors[.]" (AR 074, 092.) However, the ALJ's decision neither mentions Drs. Simutis' and Cherry's "conclusions" nor contains any indication that the ALJ in fact relied on those "conclusions" to support his finding that Mr. Gonzales can frequently interact with supervisors. In discussing Drs. Simutis' and Cherry's opinions, the ALJ referred only to their preliminary findings, i.e., their function-by-function ratings of Mr. Gonzales' degree of limitation in the basic areas of mental functioning, and never mentioned their later "conclusions" that Mr. Gonzales can "interact adequately with co-workers and supervisors[.]"(AR 022.) Because the Court "may not create or adopt post-hoc

rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself[,]" *Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007), the Commissioner's contention necessarily fails.

Additionally, Drs. Simutis' and Cherry's "conclusions" are facially inconsistent with Dr. LaCourt's examining-source opinion that Mr. Gonzales has a *moderate* limitation in interacting with supervisors.[6] Thus, to adopt the "conclusions" of Drs. Simutis and Cherry, non-examining State agency consultants, over the finding of consultative examiner Dr. LaCourt, the ALJ would have had to explain not only why he was according greater weight to the opinions of non-examining State agency consultants over those of a consultative examiner but also how the evidence on the whole supported finding a less restrictive RFC in line with Drs. Simutis and Cherry's "conclusion." *See* 20 C.F.R. § 404.1527(c) (setting forth the factors that are to be considered in weighing medical opinions and providing, in relevant part, that more weight is generally given to an examining source's opinions, opinions that are supported with explanations about how the objective medical evidence supports the opinion, and opinions that are consistent with the record as a whole). His decision plainly fails to do so.

---

[6] It is also not clear that their conclusions that Mr. Gonzales can "interact adequately" with supervisors in fact sufficiently accounts for their preliminary finding that Mr. Gonzales is *moderately* limited in in his ability to accept instructions and respond appropriately to criticism from supervisor. When a State agency reviewer finds that a claimant is "moderately limited" in an area of basic mental functioning, he or she must describe the "degree and extent of the capacity or limitation" in narrative format. POMS § DI 24510.063(B)(2) (emphases omitted). The description is *not* to include "nonspecific qualifying terms" because "[s]uch terms do not describe function and do not usefully convey the extent of the capacity limitation." POMS § DI 24510.065(B)(1)(c) (emphases omitted). Rather, the narrative must "[d]escribe, in detail, the mental capacities, limitations, and any other information that is important in the comprehensive expression of mental RFC" and "[i]ndicate the extent to which the individual could be expected to perform and sustain the activity." POMS § DI 24510.065(B)(1)(a). Drs. Simutis' and Cherry's unexplained conclusions that Mr. Gonzales can "interact adequately" with supervisors fail to describe either the degree or the extent—qualitatively or quantitatively—of Mr. Gonzales' limitation in that basic area of mental functioning. *Cf. Apodaca v. Berryhill*, No. 16-cv-150-KK, 2017 WL 1944188, at *7, 8 (D.N.M. May 9, 2017) (concluding that the ALJ's finding that the claimant could "interact appropriately with supervisors . . . on an occasional and superficial basis" adequately accounted for the State agency consultant's conclusion that "optimal work performance would likely occur in settings that de-emphasized social contacts[,]" which "adequately captured" the consultant's preliminary finding that the claimant had a "moderate limitation[]" in her ability to accept instructions and respond appropriately to criticism from supervisors (alterations and quotation marks omitted)).

In sum, the ALJ failed to (1) evince his consideration and resolution of material inconsistencies or ambiguities that he found in the medical opinions, *and* (2) explain either (a) how the RFC he assessed accounted for the mental limitations found by the different medical sources, or (b) why he rejected the uncontroverted finding that Mr. Gonzales has a *moderate* limitation in interacting with supervisors. As such, the Court must reverse the ALJ's decision and remand for further proceedings.

### C. CONCLUSION

For the reasons stated above, the Court GRANTS Mr. Gonzales' Motion to Reverse and Remand for Rehearing with Supporting Memorandum (Doc. 19).

*Kirtan Khalsa*
KIRTAN KHALSA
United States Magistrate Judge
Presiding by Consent